1  Matthew L. Sharp, Esq.
   Nevada Bar No. 4746
2  **MATTHEW L. SHARP, LTD.**
   432 Ridge St.
3  Reno, NV 89501
   (775) 324-1500
4  matt@mattsharplaw.com

5  *Attorneys for Plaintiff*

6  [*Additional Counsel Listed Below*]

7                     **UNITED STATES DISTRICT COURT**

8                          **DISTRICT OF NEVADA**

9

10 ALIREZA ZARE, Derivatively on Behalf of       Case No.:
   IDEANOMICS, INC.,
11
                    Plaintiff,
12
13 v.

14
   ZHENG WU, SHANE McMAHON,
15 ALFRED POOR, YANG CHAO, JAMES S.
   CASSANO, STEVEN FADEM, HARRY
16 EDELSON, JERRY FAN, and JOHN               **VERIFIED SHAREHOLDER**
   WALLACE,                                   **DERIVATIVE COMPLAINT**
17                                            **WITH JURY DEMAND**
                    Defendants,
18
19 and,

20 IDEANOMICS, INC., a Nevada corporation,

21                  Nominal Defendant.

22

23         Plaintiff Alireza Zare ("Plaintiff"), by and through her undersigned counsel, derivatively on

24 behalf of Nominal Defendant Ideanomics, Inc. ("Ideanomics" or the "Company"), submit this Verified

25 Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon her

26 personal knowledge as to herself and her own acts, and upon information and belief, developed from

27 the investigation and analysis by Plaintiff's counsel, including a review of publicly available

28 information, including filings by the Company with the U.S. Securities and Exchange Commission

                                              1

("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

<u>**NATURE OF THE ACTION**</u>

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Director Defendants' (as defined below) breach of fiduciary duties, gross mismanagement and for contribution under Sections 10(b) and 21D of the Exchange Act that occurred from February 1, 2017 through November 13, 2018 (the "First Relevant Period") and from March 20, 2020 through the present (the "Second Relevant Period") and have caused substantial harm to the Company.

<u>**JURISDICTION**</u>

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).  This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

4.      Venue is proper in this Court because the Company is incorporated in this county.

<u>**THE PARTIES**</u>

5.      ***Plaintiff Alireza Zare*** is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

6.      ***Nominal Defendant Ideanomics*** is a Nevada corporation, with its headquarters located at 55 Broadway, 19th Floor, New York, New York 10006. The Company's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "IDEX."

7.      ***Defendant Zheng (Bruno) Wu*** ("Wu") serves as the Company's Chairman.  Defendant Wu also served as the Company's CEO from October 2017 through November 2018.  Defendant Wu beneficially owned approximately 46.2% of the Company's common stock and Series A Preferred

1   Stock, making him a controlling shareholder.  Defendant Wu received $852,832 in compensation from
2   the Company during the fiscal year ended December 31, 2018, which consisted of $312,500 in salary,
3   $125,000 in bonus, and $415,332 in stock awards.

4        8.    **Defendant Shane McMahon** ("McMahon") is a Director and has served in that capacity
5   since July 2010.  Defendant McMahon is also the Company's Vice Chairman since January 2016.
6   Defendant McMahon also served as the Company's CEO in 2012, during which time he made a $3
7   million loan to the Company in exchange for a convertible note in the aggregate principal amount of $3
8   million at an annual interest rate of 4%.  The Company has executed several amendments to extend the
9   maturity date of the note due to McMahon.

10       9.    **Defendant Alfred Poor** ("Poor") is the Company's current CEO and has been a Director
11  since December 2018.  In connection with Defendant Poor's employment agreement, Defendant Poor
12  will receive an annual base salary of $300,000, and if the Company achieves two consecutive quarters
13  in profits from operations, the base salary shall immediately be raised to $400,000.

14       10.    **Defendant Yang Chao** ("Chao") is a Director and has served in that role since August
15  2018.

16       11.    **Defendant James S. Cassano** ("Cassano") is a Director and has served in that role since
17  January 2008.  Defendant Cassano also serves as the Chair of the Company's Audit Committee and is a
18  member of the Compensation Committee.  Defendant Cassano received $339,354 in compensation
19  from the Company during the fiscal year ended December 31, 2017, which consisted of $20,250 in fees
20  earned or paid in cash, $25,000 in stock awards, and $294,104 in option awards.  Defendant Cassano
21  received $202,800 in compensation from the Company during the fiscal year ended December 31,
22  2018, which consisted of $46,800 in fees earned or paid in cash and $156,000 in stock awards.

23       12.    **Defendant Steven Fadem** ("Fadem") is a Director and has served in that role since
24  August 2019.  Defendant Fadem also serves as the Chair of the Company's Compensation Committee,
25  and as a member of the Audit Committee and the Governance and Nominating Committee.

26       13.    **Defendant Harry Edelson** ("Edelson") is a Director and has served in that role since
27  September 2019.  Defendant Edelson also serves as the Chair of the Company's Governance and
28  Nominating Committee.

14.     **Defendant Jerry Fan** ("Fan") is a Director and has served in that role since January 2016.  Defendant Fan also serves as a member of the Company's Audit Committee and the Governance and Nominating Committee.  Defendant Fan received $339,354 in compensation from the Company during the fiscal year ended December 31, 2017, which consisted of $20,250 in fees earned or paid in cash, $25,000 in stock awards, and $294,104 in option awards.  Defendant Fan received $202,800 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $46,800 in fees earned or paid in cash and $156,000 in stock awards.

15.     **Defendant John Wallace** ("Wallace") is a current Company director and has served in that role since July 2019.

16.     Defendants Wu, McMahon, Poor, Chao, Cassano, Fadem, Edelson, Fan, and Wallace are collectively referred to hereinafter as the "Director Defendants."

## DUTIES OF THE DIRECTOR DEFENDANTS

17.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

18.     Each director owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

19.     To discharge their duties, the officers and directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the *///*

4

Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

   (a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

   (b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   (c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

   (d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

   (e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

   (f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

  20. The Director Defendant owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

21.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## **FALSE AND MISLEADING STATEMENTS**

22.     On February 1, 2017, the Company issued a press release describing the Company's acquisition of Sun Video Group HK Limited ("SVG"), stating the following:

> As previously mentioned and as part of the original deal, SVG guaranteed it would achieve certain revenue and profitability milestones within 12 months of closing the transaction . . . .  As part of the negotiation process, that revenue milestone has been increased to $250 million (up from $200 million) and the gross profit milestone has been established at $15 million.

23.     The press release failed to disclose that SVG and Wide Angle Group ("WAG") were not profitable businesses and had combined generated only $30 million in revenues and had incurred losses of $475,046 during the fourth quarter of 2016, just prior to the Company's acquisitions.

24.     Bing Yang[1] also stated in the press release: "[b]ased on all of this, today [the Company] is confident in issuing Company-wide 2017 guidance of $280 million top-line revenue."

25.     On February 2, 2017, the Company issued a press release that revealed its acquisition of 55% of WAG.   This release stated that: "[n]ot only will it [the acquisition] directly and significantly bolster the financial performance of the Wecast Services Group, but the accretive nature extends even further as [the Company] is acquiring 55% of WAG for no additional stock or monetary consideration."

26.     On March 31, 2017, an earnings call was hosted by the Company to discuss its financial projections for 2017.    During this earnings call, Defendant Wu and Mr. Bing highlighted the Company's 2017 guidance, which they announced was increased from $280 million to $300 million:

> **[Bruno Wu]:**  Before I turn the call over to Bing, I'm pleased to note the company today is raising its full-year revenue guidance from $280 million to $300 million based on recent visibility of and internal projections for 2017.  This projection is based currently on the Wecast Service Group, which, as a reminder, is a new operational and branding for the recently purchased Sun Video Group.

> **[Bing]:** But for now, as Bruno previously mentioned, we are raising our full-year, topline revenue guidance to $300 million for the full-year 2017.

---

[1]     Bing is the Company's former CEO and served in that role and as a Company director from December 2016 until he was terminated in October 2017.

6

27.    On May 15, 2017, an earnings call was held by the Company to discuss the Company's financial performance for the fiscal quarter ended March 31, 2017.  Defendant Wu reaffirmed the Company's new revenue guidance for fiscal 2017: "while we will not be providing any guidance into Q2 revenue today, based on the progression we have seen thus far and the ramp-up that we anticipate, we are reiterating our full-year top-line revenue guidance of $300 million."

28.    On November 13, 2017, the Company issued a press release regarding its recent aim to "become a global leader in providing next-generation Artificial-Intelligent & Fintech Powered, Supply Chain and Digital Finance Solutions," and touting revenues of $107 million.  The press release stated that those revenues only reflected the Company's supply chain management business line.  Defendant Wu stated that "[w]ith all that being said, I am pleased to say we are still on track to reach our top line revenue guidance of $300 million USD as projected by the Company in early 2017."

29.    This press release also stated that within the Company's crude oil business, "Ocasia is guaranteeing a minimum of $500 million worth of sales volume to the JV Partnership from December 1, 2017 until December 21, 2018."

30.    The statements made in this press release were false and/or misleading as they related to the guarantee of BT Capital and the Company's accrued revenues at that point, because they failed to disclose that the Company had a nearly $200 million yet to achieve in revenues to reach its $300 million guidance, only two months to do so, and given the Company's revenues in its video on-demand business in 2016 (approximately $4.5 million) coupled with the aforementioned, it was clear that the Company was not on track to meet its guidance.

31.    On November 20, 2017, the Company filed a Schedule 14A (the "2017 Proxy Statement").

32.    With respect to the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), the 2017 Proxy Statement provided: "[o]ur Board of Directors adopted a code of business conduct and ethics that applies to our directors, officers, employees and advisors, which became effective in January 2016.  We have posted a copy of our code of business conduct and ethics on our website at corporate.sevenstarscloud.com."

///

7

33.     The 2017 Proxy Statement was false and misleading because the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Director Defendants' failure to report violations of the Code of Conduct.

34.     The 2017 Proxy Statement was also false and misleading with regard to executive compensation in that it purported to employ "pay-for performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

35.     The 2017 Proxy Statement also failed to disclose that: (a) in light of the underperformance of the Company's SVG and WAG acquisitions, including their undisclosed revenues and combined losses, their profitability was highly unlikely; (b) the Company's crude oil business provided the Company with a mere $19 million in revenue for the fourth fiscal quarter of 2017, despite the representations to the contrary that the crude oil business provided as much as $170 million during that period; (c) the Company was not in a position to meet its fiscal 2017 guidance of $280-300 million; (d) there was no reasonable basis for the 2017 guidance provided to the investing public; and (e) the Company had been operating its crude oil and consumer electronics business merely for "research purposes" rather than for obtaining competitive returns."

36.     On December 22, 2017, the Company issued a press release reporting that it had already begun incorporating AI and blockchain technologies into its services:

> [Ideanomics] is a next-generation Artificial Intelligence and Blockchain-Powered Financial Technology Company that offers supply chain and digital finance solutions aiming to disrupt and consolidate supply chain finance, risk management and asset-backed digital securitization.  Focusing on Blockchain for a moment I want to be very clear and concise on how Blockchain is powering Seven Stars Cloud business models. . . . In this case of [Ideanomics], *we are applying Blockchain and Artificial Intelligence to create a hybrid solution for supply chain finance, risk management and asset-backed digital securitization*.  And these are only the first massive opportunities and markets we are targeting, with more plug and play opportunities to be announced in 2018.  [Emphasis added].

37.     On January 16, 2018, the Company issued a press release reporting a "preliminary and unaudited update on Q4 2017 revenues."  The press release also reported the Company's purported crude-oil business revenues for the quarter: "it is worth noting that [the Company's] crude oil supply

///

8

chain finance and management business alone . . . did a preliminarily reviewed, but still unaudited, $170 million USD in revenue in Q4 2017."

38.    The statement made in the press release was false and/or misleading because the Company's crude oil revenues for the fourth quarter of 2017 were actually only $19 million, approximately, i.e., 11% of the reported $170 million.

**THE TRUTH BEGINS TO EMERGE**
**DURING THE FIRST RELEVANT PERIOD**

39.    On February 23, 2018, the Company issued two press releases.  One press release was entitled "Seven Stars Cloud Announces BF Borgers CPA PC as New Independent Auditor," which announced BF Borgers as the Company's new auditor, after the Company had dismissed Grant Thornton, one of the largest auditors in the world, the day before.  BF Borgers, in contrast, was small and had a questionable history with the PCAOB.

40.    The Company's second press release was entitled "Seven Stars Cloud Anticipated to Achieve Record Revenues in 2017 and Provides 2018 Fiscal Year Revenue and EBITDA," which revealed that revenues would be significantly lower than the repeated guidance throughout 2017.  The press release further stated that the Company would achieve $156 million less than the $300 guidance, or between $125-$144 million for the 2017 fiscal year.

41.    According to the second press release, which quoted Defendant Wu, the Company's remediation efforts to address deficiencies uncovered related to the Company's disappointing performance included "reliev[ing] its former Chief Executive  of his responsibilities[]" as the Company shifted its business to focus on AI and blockchain.  The press release stated:

> ***Unanticipated personnel issues that led to internal communication and internal administrative oversights that materialized during the Company's 2017 fiscal year, resulted in what is anticipated to be 2017 revenue that is below prior and recent guidance expectations***.  However, the Company and management specifically, believes that it has taken strong and immediate actions to cure the causes of these deficiencies. Because of the foundation built and steps taken during 2017, the Company believes it is well positioned for continued growth in 2018.   Specifically: . . . ***The Company executed the first phase of its strategic and integration plan by acquiring, investing in, or partnering with firms focused on Artificial Intelligence, Blockchain and Alternative Trading System platforms; [and] . . . The Company relieved its former Chief Executive Officer [Bing] of his responsibilities and Mr. Robert G. Benya joined the Company as President, Chief Revenue Officer & Board Director***.   [Emphasis added].

9

42.     On the release of this news, the Company's stock price fell approximately 39.3%, from $2.80 per share at close on February 22, 2018, $1.70 per share at close on February 23, 2018.

43.     On March 30, 2018, the Company filed its 2017 Form 10-K with the SEC.

44.     In addition to confirming the Company's disappointing financial results, the 2017 Form 10-K reported the Company's blockchain and AI technologies:

> We intend to run the engine upon its Venus blockchain based platform, which includes TPaaS & VPaaS system.  As of fourth quarter of 2017, TPaaS system went into trial operation.  In 2018, we intend to strengthen our engine seven operation by including among other things i) Venus platform fully operational, and ii) establishing blockchain based supply chain finance model.

45.     On May 15, 2018, an earnings call was conducted by the Company to discuss earnings for the fiscal quarter ended March 31, 2018.  During the call, Defendant Wu reported the Company's "four layers" of blockchain technology that had integrated/was purportedly integrating into its consumer electronics and crude oil businesses to "greatly increase the margin" of its business:

> If we just do supply chain, then the gross margin is very low.  But however, the supply chain business provides a foundation for us to add four layers of pyramid on top of that, which is the digital settlement based on blockchain which is the digital wallets that based blockchain for buyers and sellers which is the digital asset trading place whereas we can capture a transaction fee over all the block chain based transactional activities in that particular industry.  And on top of that pyramid is the indexing and future derivative computation using super artificial Intelligence and dynamic ontology technology.  So we are now in the middle of transforming— we did with the crude oil. What we did with the crude oil is going to greatly increase the margin of Ocasia subsidiary and we are about ready to in the next couple of quarters do the same thing with electronic vertical.

46.     On August 13, 2018, the Company filed its quarterly report for the second quarterly period ended June 30, 2018 on a Form 10-Q (the "2Q18 10-Q").

47.     The 2Q18 10-Q stated: "[a]s part of our blockchain and AI focused strategy, we are currently focused on consumer electronics and the crude oil trading business in supply chain management with the intent to migrate this on to the blockchain with AI capabilities."

48.     The same day, an earnings call was hosted by the Company to discuss earnings for the fiscal quarter ended June 30, 2018.  During the call, Robert Benya[2] stated that "[p]roduct four is TradeTech which involves the use of blockchain, active ledger and index products to ramp up margins

---

[2]     Benya is the Company's former President and director from October 2017 until he resigned in November 2018.

10

1   significantly in our supplier chain finance services business, which is a key driver of our current and

2   rapid topline revenue growth."   As such, Benya attributed the Company's revenue growth to

3   TradeTech, which supposedly applied blockchain, and the Company's consumer electronics and crude

4   oil business through WSG, the Company subsidiary SVG was rebranded as.

5        49.   On August 28, 2018, the Company filed an amended annual report for the fiscal year

6   ended December 31, 2017, due to SEC comments about the Company's previously filed 2017 10-K

7   (the "2017 10-K/A").   The 2017 10-K/A revealed that the Company's revenues for its crude oil

8   business consisted of approximately $18.9 million from related parties, an amount significantly lower

9   than the Company's touted $170 million for the fourth quarter of 2017.

10        50.   As a result of this news, the Company's stock price fell approximately 18.2%, from

11   $4.95 per share at close on August 27, 2018, to $4.05 per share at close on August 28, 2018.

12        51.   On August 31, 2018, the Company filed a Schedule 14C with the SEC, reporting that on

13   August 3, 2018, the Board had approved the issuance of 16.5 million shares of Company stock, at

14   $1.50 per share to the Chairman, Defendant Wu's, controlled entity, BT Capital (i.e., $24.75 million),

15   which represented about half of what BT Capital would have received under the acquisition agreement

16   had the Company achieved the revenue guarantee.

17        52.   On August 31, 2018, the Company's shares were trading at a high of $4.27 per share.

18        53.   The statements above were false and misleading because (a) in light of the

19   underperformance of the Company's SVG and WAG acquisitions, including their undisclosed revenues

20   and combined losses, their profitability was highly unlikely; (b) the Company's crude oil business

21   provided the Company with a mere $19 million in revenue for the fourth fiscal quarter of 2017, despite

22   the representations to the contrary that the crude oil business provided as much as $170 million during

23   that period; (c) the Company was not in a position to meet its fiscal 2017 guidance of $280-300

24   million; (d) there was no reasonable basis for the 2017 guidance provided; (e) the Company had not

25   integrated AI and blockchain technology into its consumer electronics business and crude oil business,

26   and did not intend to do so, and therefore, blockchain was not driving the Company's revenues; (f) the

27   ///

28   ///

1   Company had been operating its crude oil and consumer electronics business merely for "research

2   purposes" rather than for obtaining competitive returns; and (g) due to the foregoing, the Company's

3   public statements during the First Relevant Period were materially false and misleading.

4   <u>**THE TRUTH EMERGES AS TO THE FIRST RELEVANT PERIOD**</u>

5   54.   Before the market opened on November 14, 2018, the Company issued a press release

6   announcing the Company's financial results for the fiscal quarter ended September 30, 2018.  The press

7   release revealed that the Company would be divesting its crude oil trading and consumer electronics

8   businesses:

9   Although to date, aside from our legacy video-on-demand business, only our
    commodities trading business has generated revenues, given that our oil trading and
10   consumer electronics businesses have realized low margins in relation to top line sales,
    we decided to focus our efforts on the higher margins we believe may be achievable in
11   our digital securitized asset business. As a result, we intend to phase out our oil trading
    and consumer electronics businesses, with the intention to fully divest these assets in
12   the near future.

13   55.   On the release of this news, the Company's stock price fell approximately 48.8%, from

14   $3.26 per share at close on November 13, 2018, to $1.67 per share at close on November 14, 2018.

15   56.   After the market closed on the same day, the Company filed its 3Q18 10-Q, reporting

16   the Company's "commodities trading business does not currently integrate blockchain or AI based

17   logistics solutions."  The 3Q18 10-Q declined to mention the "Venus blockchain" platform previously

18   highlighted in its 2017 10-K.

19   57.   In December 2018, the Company sold WSG to "Hooxi"—an entity affiliated with

20   Defendant Wu—for a "nominal amount."  The Company failed to disclose the amount; however, it

21   revealed in its annual report on April 1, 2019 (the "2018 10-K") that it had incurred a loss of

22   approximately $1.2 million loss and stated that the Wecast business earned a mere $347,000 in annual

23   sales and net assets of approximately $46,000.

24   58.   On December 14, 2018, the Company amended its 2017 10-K again, adding the

25   following sentence: "[o]ur crude oil trading business does not currently integrate blockchain or AI-

26   based logistics solutions."

27   59.   The second amended 2017 10-K further stated: "[w]hile we generate revenues from our

28   crude oil and consumer electronics business, we engage in this business largely for research purposes to

1  support our development of fintech solutions for this space, and not primarily with a view to

2  competitive returns."

3     60.     On April 1, 2019, the Company filed its 2018 10-K, which broke down the Company's

4  revenues and gross profits by segments, reporting the $19 million made in the crude-oil segment --

5  $18.9 million of which was attributed to a related party, and $260 million in revenue for the year ended

6  2018, far from the $500 million Ocasia guarantee touted by the Company.  The 2018 10-K also

7  reported that the Company's gross profit for the year fell by over 50% compared to the previous year,

8  from $7.1 million in 2017 to $3.1 million in 2018.

9     61.     In late 2019, the Company shifted its business again, to EVs and Fintech businesses.

10              **FALSE AND MISLEADING STATEMENTS**
                **DURING THE SECOND RELEVANT PERIOD**

11

12     62.     On March 20, 2020, the Company issued a press release reporting the scheduled

13  beginning of operations at its MEG Center.  The press release reported that "[t]he 1 Million square foot

14  site has been renovated as a permanent EV expo center, the cost of which has been met by development

15  funds from the Chengyang business district of the city of Qingdao, in China's Shandong province."

16  The press release continued to describe the expected operations at the massive MEG Center as follows:

17  the Company's Mobile Energy Global division ("MEG") will be joined at the site by more than 20

18  partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy

19  management, and EV charging solutions, financial services, insurance, vehicle and license plate

20  registration services, and others from Qingdao.  The EV hub is designed to be a focal point for

21  commercial fleet operators and the EV industry alike, with MEG headquartering its management, sales

22  and marketing, and administrative operations at the site.

23     63.     The press release also reported the location of the MEG Center and related prospects as

24  follows:

25         The city of Qingdao currently operates an automotive sales and servicing center for a
           range of vehicle manufacturers at the site, these operations are being assumed by MEG
26         as part of the expanded plans and focus onto EV. This will see MEG assume the
           revenues derived from those activities, with a run rate of approximately RMB 1 Billion
27         in 2019 ($140 Million USD), with profit margins in the 8% range, as well as facilitate
           an expedited ramp-up of staff and operations at the site.
28

13

> Due to the successful development of the Mobile Energy Group Center and the high demand for comprehensive EV services, MEG has received inquiries from several other cities with regards to establishing similar operations. Where there is financial support to do so, from local governments and manufacturers, and sufficient market demand as we have seen in Qingdao, MEG may decide to develop multiple regional centers in the future.

64.     On May 11, 2020, the Company filed its quarterly report for the fiscal quarter ended March 30, 2020 on a Form 10-Q (the "1Q20 10-Q").

65.     The 1Q20 10-Q reported that "[t]here were no changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2020, which have materially affected or would likely materially affect our internal control over financial reporting."

66.     On May 26, 2020, the Company issued a press release reporting that the MEG division's "Qingdao subsidiary Qingdao Chengyang Ainengju New Energy Sales and Service Co. has officially launched the largest auto trading market in Qingdao at MEG's Qingdao EV hub."  The press release stated:

> The MEG Center in Qingdao now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite. It offers a one-stop buying experience that includes financial services and onsite vehicle registration services.  The auto trading market, which was rolled into MEG as part of the investment from Qingdao City, attracts a large audience which MEG will leverage to help educate the general population through its upcoming EV-centric welcome center and onsite EV manufacturing partners.  Additionally, the Center will use influencer-based marketing of new energy and used cars to leverage the impact influencers have on big ticket purchases in Asia.

67.     The press release also reported the MEG Center as "a one million square foot EV expo center in Qingdao, Shandong Province."

68.     The press release also reported on the launch of the MEG Center as follows:

> The Center announced a soft launch on May 1, 2020 and will house partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solution providers, financial services, insurance companies, vehicle and license plate registration services, and others including a state of the art MEG Welcome Center. Ideanomics will be holding a ribbon-cutting ceremony for the MEG Center in Qingdao in the summer in conjunction with its Annual General Meeting.

69.     On June 9, 2020, the Company issued a press release reporting that "auto dealers operating in its subsidiary, [MEG] expo center in Qingdao, have sold 2,139 vehicles for a total value of

///

14

RMB 235 Million or USD 33 Million." The press reiterated that the MEG Center "began operations on May 1[]" and commented on the center's operations as follows:

> Based on the level of sales activity in the first week of June, this month's sales are expected to exceed May levels. In China, the high season for car buying is from October to January. In its first five weeks of being operational, the dealers at the MEG Center have received high levels of interest, and management is optimistic that it can achieve its previously stated RMB 1 Billion sales target in 2020.

70. The press release maintained a positive outlook for the MEG Center's profitability stating:

> China, much like the rest of the world, has been negatively impacted by the shutdowns resulting from COVID-19. As the country has only begun to relax restrictions last month, many businesses are struggling to recover. The local government provided the facility rent-free to Ideanomics. Management felt that, during these unprecedented times, MEG should support local businesses and passed on savings from the government's generosity by not charging commissions or rent to its dealers for the month of May. As MEG's partners strengthen their financial positions, management will gradually implement its fee model starting in mid-June.

> Note that the May and early June sales were primarily used vehicles, and that MEG will be charging commissions for electric vehicles (EVs) with the manufacturers' direct sale model. MEG's total financing solutions will be available starting in July, and with its high-profit margins, should make a meaningful contribution to the Center's profitability.

> 'The region loosened restrictions on business activities in early May, so we are very pleased with the Center's high levels of activity at this early stage. The Center's solid customer foot traffic indicates that the country's economy is on a steady path to recovery and there is a strong appetite for passenger and commercial vehicle sales which bodes well for MEG,' said Ideanomics Chairman Dr. Bruno Wu. 'The initial activity combined with the projected growth for the remainder of 2020 reinforces our belief that the MEG Center will be a material source of revenue for Ideanomics.'

71. The Company issued several press releases thereafter touting new orders from various groups. For example, on June 23, 2020, the Company's share price rose to over $3.00 per share, which had not occurred since November 2018.

72. The same day, the Company filed a Registration Statement on Form S-3, reporting the Company's intention to offer $250 million worth of common stock in a public offering.

73. The statements above materially false and misleading because (a) the Company's MEG Center was not a "one million square foot EV expo center" as represented to the public; (b) the Company made use of doctored photographs of its purported MEG Center in its press releases; (c) the Company overplayed the strength of its EV business operations in China; (d) the Company failed to

15

1  maintain internal controls; and (e) as a result of the foregoing, the Company's public statements in the

2  Second Relevant Period were materially false and misleading.

3  **THE TRUTH EMERGES AS TO THE SECOND RELEVANT PERIOD**

4  74.     On June 25, 2020, Hindenburg Research ("Hindenburg"), a forensic financial research

5  firm, issued a series of tweets calling out the Company's recent press releases about its MEG Center,

6  calling the Company "an egregious & obvious fraud."

7  75.     Hindenburg specifically pointed to the Company's press release issued on June 9, 2020

8  and the "2020 timestamp[ed]" image, claiming that Hindenburg "found a photo displaying the exact

9  same layout from 2018, years before the supposed soft launch of [the Company's] MEG center in

10  2020." Hindenburg's tweets also compared the two photos and maintained that the MEG logo from the

11  June 9, 2020 press release image "has been photoshopped to replace the original Mandarin.

12  76.     Hindenburg also commented on the photo included in the Company's May 26, 2020

13  press release, in which Hindenburg identified "the exact same signs of photoshopping that impose flat

14  MEG logo on a curved surface. This strikes us as a clear effort by the company to manipulate the

15  photographs in order to drive up its stock price."

16  77.     Hindenburg also sent its own investigator to the MEG Center and tweeted the picture

17  taken by the investigator, reporting that "[t]he facility is actually operated by almost 100 sales groups.

18  None of those we spoke with heard of [Ideanomics] or MEG. We spoke to the main office (in a

19  recorded conversation) and they confirmed the same."

20  78.     Hindenburg's investigator also contacted five of the Company's purported "customers

21  that are helping drive its supposed EV business." None of these "customers" were aware of the

22  Company, and "none of them were able to confirm doing business with [Ideanomics]." Hindenburg

23  also stated that "[w]e have watched [Ideanomics'] stock pump and dump on a neverending [sic] stream

24  of press releases over the last 5 years and we expect this time will be no different, resulting in major

25  shareholder losses or regulatory intervention. Buyer beware."

26  79.     The same day, J Capital Research published the JCAP Report, which called into

27  question the Company's sporadic business pivots, the purported buyers touted in the Company's press

28  ///

16

releases, the dubious operations of the MEG Center, and the Company's auditor's negative history with the PCAOB.

80.     The JCAP Report alleged that "[t]he company changes its name and promotional story so frequently that it's hard to keep up.  One thing remains a constant, despite all the press releases, buzzwords and hype: shareholders get wiped out."  In a tweet, J Capital Research also revealed that J Capital Research had "called all the 'buyers' named in [Ideanomics'] press releases this month.  Not a single one had made a purchase.  One of them thanked us for alerting them to 'fake news.'"

81.     The JCAP Report stated the following:

> [o]ur investigators have been unable to establish that IDEX has a showroom in Qingdao, whence the contract announcements have been flowing. . . .  We had a hard time identifying this expo center but eventually found an IDEX subsidiary that has a mail drop at a 1 mln sqft shopping mall in Qingdao's Chengyang District.  Renovations are news to the companies that operate there.  In fact, the shopping mall is in financial distress and is not honoring contracts with people who bought shops there, according to a local news report.  Neither the manager of the shopping mall nor two store owners we contacted in the center have ever heard of IDEX, any of its subsidiaries or joint ventures, or the EV showroom the company says it opened on May 1.

82.     In a section entitled, "The Latest Promote," the JCAP Report claimed that between "June 11-22, IDEX announced five contracts for electric vehicles . . . .  On June 23 and 24, we spoke with representatives from four of the five 'buyers.' All four denied there were contracts.  One of them went as far as to tell our staff member that the IDEX press release is 'fake news.' . . . We were unable to locate the fifth partner [.]"

83.     On June 25, 2020, the Company issued a press release reporting a deal between the Company and Zhongsen Tower, a service provider "affiliated with a division of China Tower Holdings which was ranked 71st in the Forbes Top 100 Digital Companies List and 22nd in the Fortune Future 50 in 2019."

84.     On this release, the Company's stock price fell approximately 21%, from $3.09 per share at close on June 24, 2020, to $2.44 per share at close on June 25, 2020.

85.     On June 26, 2020, the Company issued a press release responding to the above described reports, stating that the Company "would like to clarify the status of its one million square feet EV hub in Qingdao, Shandong province."  The press release provided new details regarding the MEG Center's launch:

[T]he existing new and used sales business at the site was to be folded into the MEG center activities. Along with the commencement of our fleet sales division, this compromised Phase I. The MEG center had a soft launch on May 1, with a fuller opening on May 25, 2020, as announced in press releases dated March 20, 2020, May 18, 2020, and May 26, 2020, when the center was allowed to open fully after COVID-19 lockdown measures were eased in Qingdao. These activities occupy approximately 20,000 square meters, or 215,000 square feet, and the Company has detailed activity from both existing dealership business at the site and its commercial fleet sales in recent press releases.

Phase II of the opening will see an additional 20,000 square meters come online and is subject to renovation in preparation for MEG and its participating partners. This includes the MEG welcome center and executive offices. As previously communicated, the timeline for this phase will coincide with the ribbon cutting ceremony and official opening in the summer of 2020.

Phase III of the project, and the remaining 60,000 square meters will come online as further renovations are completed.

86.     The press release directly contradicted the repeated claims that the MEG Center "is a one million square foot EV expo center" and "now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite." The information in the press release was also contrary to the Company's reminder in its June 9, 2020 press release that "the MEG Center in Qingdao began operations on May 1[]" and, for the first time, scaled back the Company's earlier representations concerning the one million square foot MEG Center, and revealing that the MEG Center was in "Phase 1" and its activities "occupy approximately 20,000 square meters, or 215,000 square feet[.]"

87.     The June 26, 2020 press release included exterior drone footage of the MEG Center. Hindenburg criticized the video footage in a series of tweets on June 28, 2020, releasing its own footage taken from the interior of the MEG Center. Hindenburg maintained: "[w]e think the reason the [C]ompany isn't posting video from INSIDE the facility is because such video shows they have absolutely no presence on site whatsoever."

88.     According to Hindenburg's investigations, reported on its website on June 26, 2020, the MEG Center "is actually called Qingdao Fidelity International Trade City . . . which shows only few cars for sale, and no sign of the company on site." Hindenburg continued: "[t]here were no signs of [the Company] having any presence on site and vendors and managers we spoke with had never heard of them. We spoke with the only vendor of electric vehicles on site . . . and he had no idea who the

company was." Hindenburg reiterated its position about the Company and maintained that it "further confirmed [its] allegations . . . about [p]hotoshopped images in the company's press releases. We were able to unearth photographs from 2015 which appear nearly identical to photos used in IDEX's May 2020 'launch' PR about the MEG."

89.     The Company issued another press release the same day attempting to refute the allegations raised by Hindenburg, stating that although the MEG Center was not one million square feet, as represented, the Company "will be expanding to 40,000 square meters and eventually 100,000 square meters."  The press release did not address the rest of Hindenburg's allegations, including those regarding the doctored photos.

90.     On the release of this news, the Company's stock price declined from $2.44 per share at close on June 25, 2020, to $1.46 per share at close on June 26, 2020, representing a total drop of approximately 53% over a two-day period.

91.     On June 29, 2020, the Company issued yet another press release, which purportedly included documentary evidence of the Company's announced deals but left numerous allegations unaddressed.

92.     On July 1, 2020 Hindenburg issued a tweet about the Company's June 25, 2020 press release, which claimed "Zhongsen Tower [was] 'affiliated with a division of China Tower Holdings,'" and noted that China Tower had issued a press release on June 30, 2020 "directly refuting this claim and 'reserving all rights to pursue legal actions.'"

93.     On July 2, 2020, the Company issued a press release "clarifying Zhongsen's relationship with provisional divisions of China Tower Group[]":

> At the end of that press release, Ideanomics referenced an entity named China Tower Holdings.  The correct reference is to provincial divisions of China Tower Group. China Tower Group, through its provincial divisions, is more accurately described as a company that works closely with, or in partnership with, Zhongsen Tower rather than "affiliated with." Further, the reference in the June 25, 2020 press release to China Tower Holdings being ranked 71st in the Forbes Top 100 Digital Companies List and 22nd in the Fortune Future 50 in 2019 was an error. The Company did not intend to indirectly reference the Hong Kong publicly listed company China Tower Corporation Limited, which has the Forbes and Fortune Future rankings.

94.     On July 3, 2020, Hindenburg announced in a tweet that it had sent a letter to the Company's Board, executive team, and auditors containing 24 sets of questions and concerns.

Hindenburg issued another tweet on July 9, 2020, publishing the text of its letter: "[l]ast week, we sent this letter to [the Company's] directors, executives, and auditors that raised numerous questions about the company's claimed operations and have not received a single response."

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

95.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

96.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

97.     Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

98.     The Company Board is currently comprised of nine (9) members -- Defendants Wu, McMahon, Poor, Chao, Cassano, Fadem, Edelson, Fan, and Wallace.  Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

99.     The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its financial results and future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Director Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

100.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

101.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute

1   this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff

2   has not made (and should be excused from making) a pre-filing demand on the Board to initiate this

3   action because making a demand would be a futile and useless act.

4   102.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to

5   have occurred and participated in efforts to conceal or disguise those wrongs from the Company's

6   stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein,

7   and are therefore not disinterested parties.

8   103.   Each of the Director Defendants authorized and/or permitted the false statements to be

9   disseminated directly to the public and made available and distributed to shareholders, authorized

10  and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries

11  of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they

12  instituted it.

13  **The Director Defendants Are Not Independent or Disinterested**

14  **Defendant Wu**

15  104.   Defendant Wu is not disinterested or independent, and therefore, is incapable of

16  considering demand because Defendant Wu founded the Company and since January 2016—with the

17  exception of a brief three-month period during which he temporarily stepped down—he has served as

18  the Company's Chairman.  Previously, Defendant Wu served as the Company's CEO from October

19  2017 through November 2018.  As the Company's CEO, Defendant Wu beneficially owned

20  approximately 46.2% of the Company's common stock and Series A Preferred Stock, making him a

21  controlling shareholder.  The Company also engaged in several related party transactions with

22  Defendant Wu's affiliated entities, including the acquisitions of several businesses from BT Capital,

23  Defendant Wu's controlled entity. Thus, as the Company admits, Defendant Wu is a non-independent

24  director.  Defendant Wu has received and continues to receive handsome compensation for his roles

25  with the Company, including $852,832 during fiscal 2018.

26  105.   Further, Defendant Wu is significantly entwined with the Company, and has benefitted

27  from several related party transactions between Ideanomics and his affiliated entities.  Thus, the

28  ///

21

1   Directors are unlikely to risk the Company's business by subjecting Defendant Wu to a lawsuit based

2   on the claims asserted herein.

3   **Defendant Poor**

4       106.    Defendant Poor is the Company's current CEO.  As the Company admits, Defendant

5   Poor is a non-independent director.  The Company provides Defendant Poor with his principal

6   occupation, and he receives handsome compensation from the Company, including the potential for

7   $400,000 and stock options of up to 2,000,000 shares.

8       107.    As the Company's highest officer during the Second Relevant Period, and as a trusted

9   Company director, Defendant Poor conducted little to no oversight of the Company's engagement in

10  the scheme to make false and misleading statements.  He also consciously disregarded his duties to

11  monitor controls over reporting and engagement in the scheme and disregarded his duties to protect

12  corporate assets.  Further, Defendant Poor is a named defendant in the Securities Class Actions and

13  faces a substantial likelihood of liability in connection thereto.

14  **Defendant Cassano**

15      108.    Defendant Cassano is a director and has served in that role since January 2008.

16  Defendant Cassano also serves as the Chair of the Company's Audit Committee and a member of the

17  Compensation Committee. Defendant Cassano has received and continues to receive compensation for

18  his role as a director.

19      109.    As a trusted Company director and as the Chair of the Audit Committee, Defendant

20  Cassano conducted little to no oversight of the Company's engagement in the scheme to make false and

21  misleading statements.  He also consciously disregarded his duties to monitor controls over reporting

22  and engagement in the scheme and disregarded his duties to protect corporate assets.  Moreover,

23  Defendant Cassano personally signed off on the false and misleading statements in the 2017 10-K.

24      110.    As such, Defendant Cassano breached his fiduciary duties, is not independent or

25  disinterested, and faces a significant likelihood of liability. Therefore, demand upon him is excused as

26  being futile.

27  ///

28  ///

**Defendant Fadem**

111.     Defendant Fadem is a director and has served in that role since August 2019.  Defendant Fadem also serves as the Chair of the Company's Compensation Committee, and as a member of the Audit Committee and the Governance and Nominating Committee.

112.     As a trusted Company director and as a member of the Audit Committee, Defendant Fadem conducted little to no oversight of the Company's engagement in the scheme to make false and misleading statements during the Second Relevant Period.  He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme and disregarded his duties to protect corporate assets.

113.     As such, Defendant Fadem breached his fiduciary duties, is not independent or disinterested, and faces a significant likelihood of liability. Therefore, demand upon him is excused as being futile.

**Defendant Fan**

114.     Defendant Fan is a director and has served in that role since January 2016. Defendant Fan also serves as a member of the Company's Audit Committee and the Governance and Nominating Committee.  Defendant Fan has received and continues to receive compensation for his role as a director as described herein.

115.     As a trusted Company director and as a member of the Audit Committee, Defendant Fan conducted little to no oversight of the Company's engagement in the scheme to make false and misleading statements.  He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme and disregarded his duties to protect corporate assets.    Moreover, Defendant Fan personally signed off on the false and misleading statements in the 2017 10-K.

**Defendant McMahon**

116.     Defendant McMahon is a director, and has served in that role since July 2010, and as the Company's Vice Chairman since January 2016.  Defendant McMahon also served as the Company's CEO in 2012.  Defendant McMahon has received and continues to receive compensation for his role as a director.

117.   As a trusted Company director, Defendant McMahon conducted little to no oversight of the Company's engagement in the scheme to make false and misleading statements.   He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme and disregarded his duties to protect corporate assets.   Moreover, Defendant McMahon personally signed off on the false and misleading statements in the 2017 10-K.

118.   Further, Defendant McMahon is party to a $3 million loan agreement with the Company, for which he received a convertible note in the aggregate principal amount of $3 million at an annual interest rate of 4% in consideration.   The Company has executed several amendments to extend the maturity date of the note due to Defendant McMahon, most recently to December 31, 2020.

## FIRST CAUSE OF ACTION

### Against The Director Defendants for Breach of Fiduciary Duties

119.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

120.   The Director Defendants owe the Company fiduciary obligations.   By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

121.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

122.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.   As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

124.   As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and

goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against The Director Defendants for Gross Mismanagement

125. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

126. By their actions alleged herein, Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

127. As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

128. Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### Against Defendants Wu and Poor for
### Contribution Under Sections 10(b) and 21D of the Exchange Act

129. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130. The Company, along with Defendants Wu and Poor are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of law, the Company's liability will be in whole or in part due to Defendants Wu and Poor's willful and/or reckless violations of their obligations as officers, directors, and controlling shareholder of the Company.

///

131.     Through their positions of control and authority as officers, directors, and controlling shareholder of the Company, Defendants Wu and Poor were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Actions and herein.

132.     As such, Defendants Wu and Poor are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

///
///
///
///
///
///
///

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 27, 2020

           **MATTHEW L. SHARP, LTD.**


           /s/ Matthew L. Sharp
           Matthew L. Sharp, Esq.
           Nevada Bar No. 4746
           432 Ridge St.
           Reno, NV 89501
           (775) 324-1500
           matt@mattsharplaw.com

           Thomas J. McKenna, Esq.*
           **GAINEY McKENNA & EGESTON**
           501 Fifth Avenue, 19th Floor
           New York, NY 10017
           Tel: (212) 983-1300
           Fax: (212) 983-0383
           Email: tjmckenna@gme-law.com
           *Pro Hac Vice application forthcoming*

           *Counsel for Plaintiff*

## VERIFICATION

I, Alireza Zare, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Ideanomics, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Ideanomics, Inc. common stock at relevant times.

ALIREZA ZARE

1